CITY LUMBER CO. and Port Everglades Steel Corp., Appellants,

v.

The UNITED STATES, Appellee.

Customs Appeal No. 5411.

United States Court of Customs and Patent Appeals.

April 13, 1972.

Guzik & Boukstein, New York City, attorneys of record, for appellants; Frank G. Parker, New York City, Gunter von Conrad, Washington, D. C., of counsel.

L. Patrick Gray, III, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Frederick L. Ikenson, New York City, for the United States.

Before WORLEY, Chief Judge, RICH, ALMOND, BALDWIN, and LANE, Judges.

RICH, Judge.

This case involves the Antidumping Act of 1921, as amended, appellants objecting to the imposition of dumping duties on three importations of portland gray cement from Portugal during 1960, two of which were entered at Bridgeport,

Connecticut, and the third at Philadelphia, Pennsylvania. The three appeals to reappraisement were consolidated in the trial court. Appellants claim that the imposition of dumping duties was illegal because the action taken by the United States Tariff Commission (hereinafter "Commission"), resulting in the imposition, was arbitrary, capricious, not supported by substantial evidence, in excess of statutory authority, and ultra vires. They also contend the Commission acted on an erroneous theory of law.

The evidence is documentary and consists entirely of a certified record of the public proceedings before the Commission.

This appeal is from the judgment of the United States Customs Court, First Division, Appellate Term, 64 Cust.Ct. 826, 311 F.Supp. 340, A.R.D. 269 (1970), affirming the judgment of a single judge sitting in reappraisement, 61 Cust.Ct. 448, 290 F.Supp. 385, R.D. 11557 (1968), which upheld the imposition of the dumping duties.

The statute principally involved here is section 201 of the Antidumping Act of 1921, as amended, 19 U.S.C. § 160. Section 201(a) reads, in part (emphasis ours):

(a) Whenever the Secretary of the Treasury (hereinafter called the "Secretary") determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States or elsewhere at *less than its fair value*, he shall so advise the United States Tariff Commission, and the said Commission shall determine within three months thereafter whether an industry in the United States *is being or is likely to be injured, or is prevented from being established,* by reason of the importation of such merchandise into the United States. The said Commission, after such investigation as it deems necessary, shall notify the Secretary of its determination, and, if that determination is in the affirmative, the Secretary shall make public a notice (hereinafter in sections 160–

173 of this title called a "finding") of his determination and the determination of the said Commission. * * * The Secretary's finding shall include a description of the class or kind of merchandise to which it applies in such detail as he shall deem necessary for the guidance of customs officers.

In accordance with the procedure outlined in Section 201(a), the following events took place, leading to this appeal:

July 20, 1961, the Acting Secretary of the Treasury advised the Commission, pursuant to § 201(a), that cement from Portugal "is being, or is likely to be, sold in the United States at less than fair value as that term is used in the Antidumping Act."

July 24, 1961, the Commission instituted an investigation to determine whether an industry in the United States was being, or was likely to be, injured by the importation of cement from Portugal.

September 14, 1961, pursuant to public notice, the Commission held a hearing at which representatives of the importers, the Portuguese exporter, and domestic producers appeared. A transcript of 182 pages of testimony resulted and exhibits and briefs were filed.

October 20, 1961, the Commission issued its determination "that an industry in the United States is being injured by reason of the importation of portland gray cement from Portugal at less than fair value within the meaning of the Antidumping Act, 1921, as amended." That determination was accompanied by a written "Majority Statement of Reasons" and the "Views of Commissioners Talbot and Overton," who dissented, eight double-spaced typewritten pages in all, identified as TC Publication 37.

October 31, 1961, the Assistant Secretary of the Treasury made public the finding of dumping.

Thereafter the importations were appraised and dumping duties assessed, appeals for reappraisements were taken to a single judge of the Customs Court who entered judgment July 9, 1968, affirming the action of the appraisers in all

respects. Application for review by the Appellate Term was filed August 5, 1968, and a judgment of affirmance was entered March 26, 1970. Petition for review by this court was filed May 25, 1970.

All three judges of the Appellate Term were in agreement with the decision of the single judge and, at the end of an extensive opinion, expressly adopted and incorporated by reference into their own opinion "each and every finding of fact and conclusion of law made by the court below." One of the several concurrent findings below is that the statutory procedural requirements of the Antidumping Act were meticulously followed by the Treasury Department and by the Tariff Commission. Appellants do not question that this is so.

The Customs Court also expressly found that there was substantial evidence to support the Commission's finding of injury. While appellants contend, as part of their general attack on the Commission's determination, that it is unsupported by substantial evidence, they do nothing to support that claim but rather take a narrower approach, basing their arguments on certain aspects of the evidence which the Commission used in support of its determination, which we will consider later. The Commission, on the other hand, stated:

> In arriving at a determination in this case, due consideration was given by the Tariff Commission to all written submissions from interested parties, all testimony adduced at the hearing, and all factual information obtained by the Commission's staff.

The record does not reveal what information the Commission obtained through its staff.

As the Appellate Term opinion observes, under the Antidumping Act Congress delegated to the Commission a broad discretionary power to determine whether an industry is being, or is likely to be, injured by the sale of imports at less than fair value. The courts have a very limited power of review over the Commission's determinations. It is not the judicial function to review or to weigh the evidence before the Commission or to question the correctness of findings drawn therefrom. Kleberg & Co. (Inc.) v. United States, 71 F.2d 332, 21 CCPA 110, T.D. 46446 (1933); compare United States v. George S. Bush & Co., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940). As stated in *Kleberg*, our review of determinations of injury or likelihood of injury in antidumping cases does not extend beyond determining whether the Commission has acted within its delegated authority, has correctly interpreted statutory language, and has correctly applied the law. As indicated in the *Bush* opinion, "No question of law is raised when the exercise of * * * discretion is challenged."

As foundation for further discussion of the contentions of the parties, it is necessary to explain some of the background facts and what the Commission had to say about them in its Determination of Injury. Prior to the events which led to the present case, the two importers who are appellants here and a third importer, not now a party but which participated in the Commission's hearing, had been jointly or severally involved in the importation of cement from Sweden and Belgium, sold in this country at less than fair value and determined by the Commission to have resulted in injury to domestic producers who had been compelled by the competition to lower prices.

The present importers argued before the Commission that their imports of Portuguese cement had not injured domestic producers because they had merely met the prevailing prices, to which the Commission replied that to embrace this conclusion one must overlook the fact that the prices thus "met" had already been depressed by earlier imports of dumped cement from countries other than Portugal and described the Portuguese imports as having a "hammering effect" on prices. The Commission concluded:

> Depressed prices kept depressed by recourse to new forms of the old depressant constitutes, for the domestic

producers, merely a prolongation of the very injury from which it was hoped they had already gained relief.

\* \* \* \* \* \*

\* \* \* We must conclude, therefore, that with the purpose of dumping already having been accomplished in the U. S. market, the resultant depressed prices leave little consolation to the domestic industry forced to meet such prices and thereby compelled to suffer continued injury if it wishes to compete. A denouement of such character was never the purpose of the Antidumping Act, and such procedure meets neither the letter nor the spirit of the act.

\* \* \* In the instant investigation, it is noted that the three importers of Portuguese cement also imported cement from other countries [Sweden and Belgium] wherein the Treasury Department found the sales to have been made at less than fair value.

In the process of thus setting forth its "reasons," the Commission also made the following observation, on which appellants base one of their principal arguments in this court:

> However, with the termination of the two earlier investigations, plus the current one involving imports from Portugal, the end is not yet in sight. In recent months two of the same three importers have imported cement from one or more of the countries Poland, Israel, and Yugoslavia. The Treasury Department has already issued notices that it has "reason to believe or suspect" that sales of portland cement from these three countries have been made in the United States at less than fair value.

In fact, it was eventually found that none of these importations from Poland, Israel, and Yugoslavia was sold at less than fair value. 27 Fed.Reg. 8287 (1962), 28 Fed.Reg. 41 (1963), and 28 Fed.Reg. 6660 (1963).

In both lower courts appellants argued, unsuccessfully, that the Commission had acted *illegally* for three different but somewhat interrelated reasons: (1) in construing the term "injury" in section 201(a), quoted supra, to include the continuation or prolongation of an injury caused previously by less-than-fair-value imports from other countries; (2) in basing the determination of injury on imports which came from countries other than Portugal; and (3) in basing said determination on irrelevant factors such as the identity of the importers. In affirming the single judge, the Appellate Term (1) held that the language of the Antidumping Act manifests a congressional intent to protect domestic industry "from sales at less than fair value which either caused *or continued* an injury to a competing domestic industry" (our emphasis), thus approving the application of the continuation of injury theory by the Commission; (2) rejected appellants' argument that consideration should have been given only to the effect of the importations from Portugal without considering the effect of importations from other countries, saying:

> Indeed, an investigation of imports *from only one country*, in disregard of the effect on the market area in question, of *sales at less than fair value from other countries*, would result in a study and conclusions that would be myopic and unrealistic. An investigation so limited and restricted would not help achieve the statutory remedy envisaged by the enabling legislation. It would seem clear that the mischief that the act aimed to remedy required a broad solution. [Emphasis ours.]

(3) On the point that consideration had been given to the identity of the importers with the possible implication that their intent for the future was involved, the lower court had nothing specific to say.

In appealing to this court, appellants abandon the principal arguments on which they relied below. They continue to insist on the illegality of the Commission's determination of injury but they no longer argue either the dependence on the effects of the prior importations from Sweden and Belgium or the "con-

tinuation of injury" principal as grounds of illegality. Their present case is that the Commission's decision is "null and void for three independent reasons": (1) the "continuation of injury" finding was predicated on "a competitive market area wholly or substantially different from that involved in previous injury determinations"; (2) the Commission acted ultra vires in basing its determination, "in whole or in part, on as yet unconcluded and undecided investigations of possible LTFV [less than fair value] importations, which in fact were eventually held by the Treasury Department *not* to be LTFV importations" ; (3) the Commission acted ultra vires in basing its determination "in whole or in part, on the alleged *intention* of the *importers* to systematically import cement in the future at less than fair value." We shall consider these three contentions seriatim.

## OPINION

### I. *The Different Market Areas Question*

The Government contends with some justification that this is a question which was not raised below, suggesting that under well-established authority we need not consider it. Appellant counters with various oblique references in footnotes in its brief in the lower court to market areas, contending that it did raise the question. While we are of the opinion that it certainly was ont presented as a clear issue calling for a ruling in the brief before the Appellate Term, we will give appellants the benefit of the doubt and pass on the merits of their position, on which the Government has presented its views. It has a simple solution.

■■ Without getting into a discussion of all of the market areas into which Belgian, Swedish, and Portuguese LTFV cement was imported, suffice it to say that appellants' brief admits to the importation of "less than one-fourth [apparently 23½%] of the Portuguese cement here in question" into Fall River, Massachusetts, an area they also admit

overlaps an area into which the LTFV Swedish cement was previously imported, resulting in the earlier determination of injury by the Commission. The Commission stated in its "Reasons" that "The imports of Portuguese portland cement which are injuring the domestic industry concerned are entering at Bridgeport, Conn., Fall River, Mass., and Trenton, N. J. * * *." Certainly the Commission took Fall River imports into account. We deem appellants' admission to show that there was substantial evidence to support the Commission's determination, which eliminates one of their arguments for its invalidity. Moreover, the substance of this argument, in our view, is that appellants would have us weigh the evidence before the Commission. We need cite no authority for the proposition that we cannot do that because in their brief below appellants admit that "the court may neither substitute its judgment in factual matters for that of the Tariff Commission in an injury determination under the Antidumping Act, nor may it weigh the evidence before the Commission * * *." The Commission is under no obligation either to disclose all of the evidencé in its possession nor to state in meticulous detail exactly on what basis it applies that evidence in determining injury or likelihood thereof. This point is, therefore, without merit.

### II. *The Imported Cement from Poland, Israel and Yugoslavia*

■ Appellants argued this point below as a part of their broader argument that imports from no country other than Portugal should be considered. They have given up the argument based on Swedish and Belgian imports and concentrate on which the Commission said about the three countries named in the heading. They say that the comment, which we have quoted in full above, shows that the Commission based its determination at least in part on unconcluded investigations which in the end were terminated favorably to the importers and that this "fatally tainted" the determination. We disagree. The quo-

tation shows clearly that the Commission was aware that it had not yet been determined by the Treasury that these importations were at less than fair value. Two pages later in its Statement of Reasons the Commission said:

> When meeting its obligation under the Antidumping Act, the Commission gives consideration *only* to the criterion imposed upon it—viz., whether the imports *identified by the Treasury Department as having been sold at less than fair value* injure "an" industry, or prevent its establishment. [Emphasis ours.]

The Commission then proceeded to discuss the imports from Portugal vis-a-vis those from Sweden and Belgium which were held to have been at less than fair value. Reading the Commission's statement in toto we regard what it said about imports from Poland, Israel, and Yugoslavia as more or less in the nature of an aside. Even if *some weight* was given to that situation, however, appellants are asking us to transform a mere matter of weight of the evidence, which they admit is none of our business, into a fatal taint which wholly invalidates the Commission's determination of injury, which there is much other evidence to support even in the public record. The argument falls by its own weight, and we decline to so weigh the evidence.

### III. *The Importers' Intent*

[8] The Government asserts that this point, that the Commission gave weight to an alleged intention to systematically import cement at less than fair value, was never raised below and therefore is an issue raised for the first time on appeal. Appellants' Reply Brief makes an attempt to refute this which we consider wholly unsuccessful. We do not refuse consideration altogether on this technicality, however, because it seems preferable to state our view that intent is a perfectly legitimate matter for the Commission to take into consideration. The statute refers not only to injury but also to likelihood of injury, which clearly envisages future events and the probability of their occurrence according to someone's intent.

For the reasons stated above, we find no merit in the three arguments appellants have presented in this court to show error in the decision below and therefore do not find it necessary to consider their fourth point which related to the power of this court to set aside the determination of the Tariff Commission.

The judgment of the Customs Court is affirmed.

Affirmed.

WORLEY, C. J., took no part in the decision of this case.